**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

DALE ALFORD,

                                   Plaintiff,

    v.                                                    No. 12-CV-977
                                                        (NAM/CFH)

CAROLYN W. COLVIN, Commissioner of
Social Security,

                                          Defendant.

_____

**APPEARANCES:**                        **OF COUNSEL:**

THE OLINSKY LAW GROUP        KAREN S. SOUTHWICK, ESQ.
Attorney for Plaintiff
300 S. State Street
Fifth Floor, Suite 520
Syracuse, New York 13202

HON. RICHARD S. HARTUNIAN     VERNON NORWOOD, ESQ.
United States Attorney for the         Special Assistant United States Attorney
    Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

      Plaintiff Dale A. Alford ("Alford") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner")

denying his application for benefits under the Social Security Act.  Alford moves for a

finding of disability and the Commissioner cross-moves for a judgment on the

_____

    [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

pleadings.  Dkt. Nos. 16, 17.  For the reasons which follow, it is recommended that the Commissioner's decision be affirmed.

# I. Background

## A. Facts

Born on September 16, 1964, Alford was forty-five years old when he applied for disability benefits.  T. 89, 96.[2]  Alford graduated from high school and completed two years of college education.  T. 126, 422.  Alford also served in the miliary.  <u>Compare</u> T. 89 (outlining dates of service as January 1, 1985 through December 30, 1989) <u>with</u> T. 422 (testifying that he was in the Navy for six years).  Alford's previous work experience includes retail, food service and restaurant management, and driving trucks.  T. 122, 424-27.  Alford presently works as a janitor for a construction company.  T. 428-29.  Alford alleges disability from multiple impairments including complications from a brain aneurysm, restless leg syndrome, Crohn's disease, Bell's palsy, sleep apena, and headaches.  T. 121, 429.

## B. Procedural History

On June 30, 2009, Alford protectively filed an application for disability insurance benefits and social security income ("SSI") pursuant to the Social Security Act, 42 U.S.C. § 401 <u>et seq.</u> claiming an alleged onset date of December 31, 2008.  T. 89-100. That application was denied on September 2, 2009.  T. 46-56.  Alford requested a

---

[2]"T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  Docket No. 10.

hearing before an administrative law judge ("ALJ"), Edward Pitts, which was held on July 1, 2010.  T. 59-88, 417-451 (transcript of the hearing).  In a decision dated August 26, 2010, the ALJ held that Alford was not entitled to disability benefits. T. 15-33. Alford's counsel filed a timely request for review with the Appeals Council and on March 8, 2011 the request was denied, thus making the ALJ's findings the final decision of the Commissioner.  T. 3-14.  This action followed.

## II. Discussion

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey

v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported

by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at

31.


## B.  Determination of Disability[3]

"Every individual who is under a disability shall be entitled to a disability. . .

benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment . . . which has lasted or can be expected to last for a

continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically

determinable impairment is an affliction that is so severe that it renders an individual

unable to continue with his or her previous work or any other employment that may be

available to him or her based upon age, education, and work experience.   Id. §

423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical

and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the

impairment is "based [upon] objective medical facts, diagnoses or medical opinions

inferable from [the] facts, subjective complaints of pain or disability, and educational

background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018(NRB),

2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d

---

[3] While the SSI program has special economic eligibility requirements, the
requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI)
and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are
identical, so that "decisions under these sections are cited interchangeably."  Donato v.
Sec 'y of Health and Human Servs., 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation
omitted).

1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. §

404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he [or she] is not, the
> [Commissioner] next considers whether the claimant has a 'severe
> impairment' which significantly limits his [or her] physical or mental ability
> to do basic work activities. If the claimant suffers such an impairment, the
> third inquiry is whether, based solely on medical evidence, the claimant
> has an impairment which is listed in Appendix 1 of the regulations. If the
> claimant has such an impairment, the [Commissioner] will consider him [or
> her] disabled without considering vocational factors such as age,
> education, and work experience; the [Commissioner] presumes that a
> claimant who is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity. Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity to perform his
> [or her] past work. Finally, if the claimant is unable to perform his [or her]
> past work, the [Commissioner] then determines whether there is other
> work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). The plaintiff bears the initial

burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134

F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry

progresses to the fifth step, the burden shifts to the Commissioner to prove that the

plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing

Berry, 675 F.2d at 467).


## C. ALJ Pitts's Findings

Alford, represented by counsel, testified at the hearing held on July 1, 2010. T.

417-451 (transcript from the administrative hearing). Using the five-step disability

sequential evaluation, the ALJ found that Alford (1) had not engaged in substantial

gainful activity since December 31, 2008, the alleged onset date; (2) had the following severe medically determinable impairments: chronic right side weakness affecting both the right leg and arm post aneurysm; seizure disorder with syncope; Crohn's disease; and sleep apnea; (3) did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintains "the residual functional capacity [("RFC")] to perform sedentary work . . . except that he may occasionally climb ramps or stairs or avoid concentrated exposure to hazards . . . and must be allowed normal bathroom breaks due to Crohn's disease," and thus, (5) given his age, education, work experience, and RFC, was capable of engaging in employment which exists in significant numbers in the national economy. Therefore, a determination of not disabled was made.

### D. Alford's Contentions

Alford first contends that the ALJ failed to properly determine the severity of his restless leg syndrome. Alford next alleges that the ALJ failed to properly establish his RFC, based on the fact that the ALJ erred in failing to obtain a medical source statement ("MSS") from Alford's treating physician and the RFC was not supported by substantial evidence. Alford then asserts that the ALJ improperly evaluated Alford's credibility. Alford lastly argues that the ALJ erred by relying on the Grids as the RFC was improperly developed and Alford's non-exertional limitations required the testimony of a vocational expert.

### 1. Severity

As mentioned above, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities for a continuous period of time of not less than one year. See subsection II(B) supra. Thus, a diagnosis alone is insufficient to establish a severe impairment as instead, the plaintiff must show that the medically determinable impairments significantly limit the ability to engage in basic work activities. 20 C.F.R. § 404.1521(b). The ability to do basic work activities is defined as "the abilities and activities necessary to do most jobs." Id. Basic work activities which are relevant for evaluating the severity of an impairment include:

(1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

Id.; see also Pickering v. Chater, 951 F. Supp. 418, 424 (S.D.N.Y.1996); see also Social Security Ruling 85-28, 1985 WL 56856, at *3-4, Titles II and XVI: Medical Impairments That Are Not Severe (S.S.A. 1985).

Furthermore, the plaintiff must also establish the duration of the impairment, namely that it is "expected to result in death [or] has lasted or is expected to last for a continuous period of at least [twelve] months." Gray v. Astrue, No. 04-CV-3736 (KMW/JCF), 2009 WL 1598798, at *5 (S.D.N.Y. June 8, 2009) (citing 20 C.F.R. § 416.909). "Courts, therefore, reverse for legal error SSA decisions that inappropriately conflate the analysis of severity with the analysis of duration." Id. (citing Stadler v.

7

Barnhart, 464 F. Supp. 2d 183, 189 (W.D.N.Y. Dec. 11, 2006) ("To state that an impairment is not severe because it does not meet the twelve-month requirement . . . is inconsistent with the . . . regulations.").

When denying a claim based upon insufficient duration, the ALJ must explicitly express a finding that:

> Within 12 months of onset, there was or is expected to be sufficient restoration of function so that there is or will be no significant limitation of the ability to perform basic work-related functions . . . ; or
>
> Within 12 months of onset, there was or is expected to be sufficient restoration of function so that in spite of significant remaining limitations the individual should be able to do past relevant work or otherwise engage in [substantial gainful activity], considering pertinent vocational factors.

Stadler, 464 F. Supp. 2d at 190 (quoting S.S.R. 82-52, at *3) (internal citations omitted). "In the latter case, a thorough documentation, evaluation, and rationalization of the [plaintiff's] RFC, work history, and vocational potential will be necessary." S.S.R. 82-52, at *3 (citations omitted).

The ALJ found that Alford's "medical records do not document any restrictions or limitations as a result of [his restless leg syndrome] . . . ." T. 21. The ALJ further expanded on this conclusion, discussing Alford's complaints of pain in January 2010, provision of medication in February 2010, and normal neurological and Doppler studies of Alford's legs. T. 24. The ALJ went on to explain that "[t]he records do not document any significant limitations resulting from his complaint of pain in his shins . . . .," also noting that Alford intended to return to operating his truck and was working as bus monitor without issue. Id.

8

Alford contends that his medical records indicate a more severe condition than the ALJ explained. Alford testified that his legs cramp and lock up three to four times per day and he must stand and walk to relieve the cramping. T. 435. These symptoms also strike during the night while he is asleep. Id. Medication seems to help. Id. Alford also stated that he had to discontinue working as a computer technician because he "wasn't able to grasp [the job] and [couldn't] . . . physically . . . do it," because of his legs. T. 425-26. Alford stated that a subsequent job at K-Mart was also too difficult to do because of his legs. T. 426. Alford's brief alleges that this testimony shows his restless leg syndrome has interfered with is ability to do work for more than a decade. Pl. Memo. of Law (Dkt. No. 16) at 16.

However, in the minutes before, Alford also testified that he was in restaurant management for seven years prior, was tasked with taking care of the operation of the restaurant and physical property, enjoyed that work, and was unsuccessful at securing a similar position after his family sold their restaurant. T. 424-25. Further, Alford reported that while working in that capacity he would walk four hours a day, stand five hours a day, and lift up to 200 pounds. T. 122. Moreover, after his work as a computer technician but prior to his work at K-Mart, Alford was employed stocking shelves at Price Chopper until he was terminated due to a miscommunication with other staff. T. 426. Such testimony contradicts assertions that the restless leg syndrome significantly impeded his ability to work.

On July 16, 2008, Alford complained to his primary care physician, Dr. Ram, of bilateral leg cramping. T. 248. The medical notes indicate that the cramping may have been caused by the medication that Alford was taking, and recommended that he

9

cease that prescription.  Id.  Alford had two subsequent appointments in August, where he did not mention leg pain (T. 250-53) and then returned in November 2008 again complaining of bilateral leg pain.  T. 254.  The pain was present for an undetermined amount of time and it improved while he was standing.  Id.  Alford also reported that he had been raking for the past month.  Id.  Dr. Ram recommended that Alford cease taking another medication and have various tests done.  T. 255.

In December 2008, Alford underwent bilateral lower extremity arterial flow studies.  T. 280, 282.  The results of the studies were normal.  Id.  When Alford returned to Dr. Ram in December for his lab results, it was noted that his legs were now throbbing, but not cramping, and that the pain was continuing, but weak.  T. 258.  Alford's gait remained normal and the comments Dr. Ram made were primarily with respect to after affects of his stroke.  T. 259.  Alford again returned to Dr. Ram in February of 2009 contending that he was having cramps while sleeping, but that he had been taking Tylenol with some relief.  T. 260.  Dr. Ram's treatment notes from February 2009 through May 2009, representing seven office visits, fail to include complaints of leg cramping or throbbing or similar musculoskeletal complaints.  T. 262-75.

Alford's next complaints of restless leg syndrome were voiced on January 5, 2010 when he had an appointment with neurologist Dr. Braiman.  T. 364.  Notes indicate that the level of medication presently prescribed was insufficient to "prevent[] the extreme discomfort [Alford] gets in his shins around 3:30 in the morning."  Id.  However, six weeks later, Alford returned to Dr. Braiman and notes indicate that the medication was helping his restless leg syndrome, his gait was normal, and there were no further complaints or notations regarding insufficient treatment.  T. 363.

The medical evidence indicates that Alford received consistent treatment from 2008 through 2010 and that, while there were some complaints about throbbing or cramping, those complaints were not persistent, were met with treatment by medication, and indicated general improvement. Just because Alford was diagnosed with restless leg syndrome does not automatically mean that such represents a per se severe impairment. See 20 C.F.R. § 404.1521(b). None of the medical sources noted any limitations due to Alford's restless leg syndrome. Alford's prior work indicated long hours standing in retail and working as a bus monitor as well as present work doing janitorial tasks. The diagnostic tests which were performed on Alford's legs indicated normal results. Moreover, his last reports from both Dr. Ram and Dr. Braiman seem to indicate that his symptoms are being successfully managed. Such constitutes substantial evidence that his diagnosis is not severely interfering with his ability to do work.

Alford asks that the undersigned rely on part of the evidence in the medical record; however, "[w]here an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." Yancy v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). In this case, for the reasons stated above, there was substantial evidence to conclude that Alford's restless leg syndrome did not rise to a severe level. "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) (citations omitted). Accordingly, the ALJ's decision should be affirmed.

Moreover, it was clear that the ALJ considered the affects of all of Alford's

afflictions, both severe and non-severe, in determining his RFC. T. 22-27. Even if the restless leg syndrome was deemed severe, of which the undersigned contends for the reasons discussed above, it is not, it is of no consequence. The Second Circuit has held that where an ALJ identified some, but arguably not all, of the severe impairments at step two, and continued to "proceed[] through the sequential evaluation process . . . consider[ing] the 'combination of impairments' and the combined effect of 'all symptoms' in making his [or her] determination," the ALJ's decision would not warrant remanding. Stanton v. Astrue, 370 Fed. Appx. 231, 233 n.1 (2d Cir. Mar. 24, 2010) (citing 42 U.S.C. § 423(d)(2)(B) ("In determining whether an individual's . . . impairments are of a sufficient medical severity . . . [to] be the basis of eligibility . . . the Commissioner . . . shall consider the combined effect of all the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.")). If anything, that mistake would be considered harmless error. Especially in light of the findings infra that the ALJ's RFC determination was supported by substantial evidence.

## 2. RFC

The ALJ determined that Alford retained the RFC "to perform sedentary work . . . except that he may occasionally climb ramps or stairs or ladders, ropes or scaffolding; may occasionally balance, stoop, kneel, crouch or crawl; must avoid concentrated exposure to hazards such as moving machinery, heights, etc. and must be allowed normal bathroom breaks due to Crohn's disease." T. 22. In reaching this assessment, the ALJ discussed the notes and opinions of Drs. Braiman, Boehlert, and Shapiro

extensively, in addition to those of treating physician Dr. Ram.

### i.  Treating Physician's Rule

Alford contends that the ALJ erred when he failed to recontact Dr. Ram for a Medical Source Statement ("MSS") or assess more weight to Dr. Boehlert's assessment.  When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134.  "This rule applies equally to retrospective opinions given by treating physicians."  Campbell v. Astrue, 596 F. Supp. 2d 445, 452 (D. Conn. 2009) (citations omitted).  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this

opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. Id. at 133-34; see 20 C.F.R. § 404.1527(e) (2005).

Alford first contends that the ALJ was under a duty to request a MSS from treating primary care physician Dr. Ram. Dr. Ram treated the patient for sixteen months and her office notes and treatment records comprise more than eighty pages of the record. T. 238-323. The ALJ discussed the findings of Dr. Ram at great length in his opinion. T. 25-26.

An ALJ has an affirmative duty to develop the administrative record during Social Security hearings, even when the claimant is, as in this case, represented by counsel. See Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (citations omitted); see also 20 C.F.R. § 404.1512(d) (describing Commissioner's duty to develop a "complete medical history for at least the [twelve] months preceding the month in which [claimant] file[s an] application . . . ."); 20 C.F.R. § 404.1512(e)(explaining how the Commissioner will attempt to retrieve the entire medical history from claimant's treating sources as opposed to always seeking consultative examinations). Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (citations omitted); see also Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional

14

information in advance of rejecting a benefits claim.") (citations omitted); <u>Roat v. Barnhart</u>, 717 F. Supp. 2d 241, 264 (N.D.N.Y. 2010) (holding that where a "medical record paints an incomplete picture of [claimant's] overall health during the relevant period, as it includes evidence of the problems, the ALJ had an affirmative duty to supplement the medical record, to the extent it was incomplete, before rejecting [claimant's] petition.") (internal quotation marks and citations omitted).

This duty exists, in varying degrees, depending upon whether or not the claimant is represented and in what capacity. <u>See</u> <u>Smith v. Bowen</u>, 687 F. Supp. 902, 906 (S.D.N.Y. 1988) ("The ALJ's duty to develop the comprehensive record . . . is greatest when claimant is unrepresented; but the duty still exists when plaintiff is represented and even more . . . where plaintiff if represented . . . by a paralegal."); <u>see</u> <u>also</u> <u>Cruz v. Sullivan</u>, 912 F.2d 8, 11, (2d Cir. 1990) ("[W]hen the claimant is unrepresented, the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all of the relevant facts.") (internal quotation marks and citations omitted). Specifically, when discussed in the context of a treating physician, the inquiry has revolved around the quality of the records which have been provided to the ALJ for review. <u>See</u> <u>Moore v. Astrue</u>, No. 11-CV-952 (TJM/CFH), 2013 WL 935855, at *4-*5 (N.D.N.Y. Feb. 5, 2013).

> [I]t is not sufficient for the ALJ simply to secure raw data from the treating physician. What is valuable about the perspective of the treating physician . . . is his opportunity to develop an informed <u>opinion</u> as to the physical status of a patient. To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician who sees the claimant once and who performs the

same tests and studies as the treating physician.

Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991).

In this case, for the reasons stated above, a MSS was not required from Dr. Ram.  The treatment notes included detailed comments discussing how Alford was feeling and progressing, what the test results meant, and how medication was affecting him.  While not formatted as a MSS, the content of these reports was sufficient to indicate that a severe impairment did not exist.  Moreover, if Alford wanted a MSS submitted, counsel had the opportunity to provide additional submissions for the record at the beginning of the hearing.  T. 420.  Counsel declined.  Id.  Accordingly, given the fact that counsel had the opportunity to supplement the record and chose not to, as well as the fact that there was no appreciable gap in the record as the treatment notes contained a sufficient opinion with which to assess Alford's physical limitations, the ALJ's decision should be affirmed.

To the extent that Alford contends a MSS should have been provided to account for limitations due to syncope or cognitive defects secondary to Alford's stroke, such contentions are also incorrect.  Dr. Ram "advised [Alford] against driving trucks for a living," given his "symptoms [which were] suggestive of the late effects of the stroke." T. 259.  Accordingly, Dr. Ram's opinion was clear regarding Alford's limitations. However, this opinion was rendered in December of 2008.  Id.

In February of 2009, Alford underwent CT scans of his brain which were normal other than seeing expected remnants from the craniotomy he underwent in April 2002 for an aneurysmal clipping.  T. 284.  CT scans were again performed in May of 2009, rendering identical results.  T. 286.  In June, Alford returned to neurologist Dr. Braiman,

seeking evaluation after "two syncopal spell[s] that have occurred within the past year." T. 367. Dr. Braiman outlined that the spells did not cause Alford to "lose awareness or consciousness [and t]here were no witnessed convulsions or erratic motor behavior." Id. Furthermore, Dr. Braiman noted that Alford "has gone through a period of over a year now where he has had no convulsions at night or during the day." Id. Further, Dr. Braiman pointed to the "two standard EEG's, both of which have shown no abnormalit[ies] . . . [or] new findings . . . ." Id. On exam, Dr. Braiman noted "no cognitive dysfunction," with clear memory. Id. Further, Alford's gait and strength were all normal. T. 368. Dr. Braiman ordered additional tests to confirm whether Alford was at a risk of seizures, and gave Alford "the usual cautions about driving although he has not had any losses of consciousness at any time." Id. At the end of June, Alford saw Dr. Ram contending he experienced syncope with a collapse when he got out of the shower. T. 276.

In July of 2009, Alford underwent two extended EEGs and a EKG which demonstrated "mildly abnormal [findings] . . . consistent with his injury in that area. No potential epileptogenic abnormalities were seen." T. 369. In September, when Alford returned to Dr. Braiman, Alford stated that he had not been experiencing any other problems, but was not tolerating one of his medications very well. T. 366. Alford returned to Dr. Braiman in January of 2010, where he reported that he had not had any seizures since he was last seen, Alford demonstrated no cognitive dysfunctions, and had "[s]table epilepsy without seizure recurrence . . . ." T. 364. Dr. Braiman also instructed that Alford could "[r]eturn in six weeks with an application from the department of Motor Vehicles to regain driving privileges." Id. Six weeks later, Alford

17

did just that, returning to Dr. Braiman reporting "no seizures, lapses of awareness or convulsions." T. 363. Alford asked Dr. Braiman to complete DMV paperwork to regain his driving privileges. Id. Alford also reported that he had not experienced any headaches in the last four months. Id. Notes indicate that Alford was alert and without cognitive dysfunction, with a normal gait, and "[s]table symptomatic epilepsy post aneurysmal clipping . . . ." Id.

In this case, the ALJ relied more heavily on the conclusions from Dr. Braiman than he did on those from Dr. Ram. Dr. Braiman treated Alford on multiple occasions immediately after his craniotomy and during 2009 and 2010. He is a board certified neurologist, a specialist. And ultimately, based on examination, multiple unremarkable diagnositc studies, and Alford's representations, Dr. Braiman concluded that Alford was without cognitive dysfunctions and was able to drive given his prolonged amount of time without experiencing a seizure. Again, this constitutes a complete picture of Alford's medical diagnosis and prognosis as well as his physical abilities and limitations. Dr. Ram's findings and conclusions were inconsistent with this substantial evidence, accordingly, the ALJ was correct in relying more heavily on Dr. Braiman. Furthermore, incorporating Dr. Braiman's findings into Alford's RFC was appropriate as it was consistent with the other medical evidence in the record.

Lastly, to the extent a MSS was required to show complications of Crohn's disease, that too was not required. Much like the previous conclusions, the medical record itself was complete and spoke to whether or not Alford's Crohn's disease was severe. In February of 2009, Dr. Ram's records reflect that Alford had stopped taking his medication for Crohn's disease and had no reported symptoms. T. 260. The

18

following appointment a few weeks later reflected that Alford was feeling well, exercising, denying gastrointestinal symptoms, and taking his medications as prescribed.  T. 262.  In March of 2009, Alford complained of diarrhea and nausea to Dr. Ram.  T. 266.  He returned again a few weeks later, again complaining of the same abdominal pain and contending that it had worsened and was accompanied by four bowel movements a day.  T. 268.  Examination by palpation found distension and tenderness in the left lower quadrant of Alford's abdomen.  T. 269.  When Alford returned again in April with the same complaints, he was given Pentassa[4], and Dr. Ram reached out to a gastroenterology doctor.  Id.  On May 16, 2009, Alford returned to Dr. Ram after a colonoscopy was performed in April which found that Alford had active colitis[5].  T. 272.  When Alford was next seen by Dr. Ram four days later, he denied any gastrointestinal symptoms.  T. 274.  Upon examination with Dr. Boehlert, for Alford's internal medical examination, it was noted that he had Crohn's disease since 2002 which was treated with medication which improved his symptoms.  T. 331.  This evidence appears to show a sudden onset of colitis, which was properly treated and reconciled.  This was not an ailment which lasted, or was projected to last, for an extended period of time.  Moreover, the lack of further complaints, both prior and subsequent to the March 2009 flare up, indicate a well controlled medical condition.

Accordingly, the ALJ's decision to not to seek a MSS from Dr. Ram was not in

---

[4] "Pentassa (mesalamine) affects a substance in the body that causes inflammation, tissue damage, and diarrhea [and] . . . is used to treat ulcerative colitis, procitis, and proctosigmoiditis."  Available at http://www.drugs.com/pentasa.html (last visited October 11, 2013).

[5] Colitis is an "inflammation of the colon."  DORLAND'S ILLUSTRATED MED. DICTIONARY 352 (28th ed. 1994) [hereinafter "DORLAND'S"].

error and should be affirmed.  Moreover, for the reasons discussed above and supplemented below, the ALJ's decision to accord more weight to Dr. Braiman and rely on those findings in shaping the RFC was supported by substantial evidence.

### ii.  Substantial Evidence

Alford also contends that the ALJ's RFC determination was not supported by substantial evidence.  RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms.  Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945.  "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."  Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).  The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]."  Pourpre v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

> Each finding as to the plaintiff's functional abilities must be supported by substantial evidence because conclusory statements regarding plaintiff's capacities are not sufficient . . . Only after the ALJ has described the plaintiff's capabilities on a function-by-function basis supported by substantial evidence may RFC then be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy,

20

and very heavy.

DiVetro v. Comm'r of Soc. Sec., No. 05-CV-830 (GLS/DEP), 2008 WL 3930032, at *2
(N.D.N.Y. Aug. 21, 2008) (internal quotation marks and citations omitted).

Dr. Boehlert concluded that Alford "ha[d] moderate to marked limitation to heavy
exertional activity of the right hand . . . mild to moderate limitation to heavy walking or
exertional activity in the standing position . . . [and] should avoid ladders or working at
heights or . . . near heavy machinery or driving due to seizure disease." T. 334. During
his examination, Dr. Boehlert noted that Alford "uses a cane for long walks," but did not
require it for the exam, he could complete his activities of daily living independently, his
gait was normal, he could fully squat, he required no assistance getting on and off the
exam table or rising from a chair, he exhibited full strength in his lower extremities, and
his dexterity in both hands was intact, though slower in his right, with full grip strength.
T. 330-334. Ultimately, Dr. Boehlert stated that Alford had a fair prognosis. T. 333.

Alford contends that the ALJ improperly credited Dr. Boehlert's assessment
because he found it credible only to the extent that it was consistent with his RFC
assessment. T. 27. However, in reading the ALJ's RFC assessment, he utilized most
of Dr. Boehlert's assessment. Id. There is no error in this, as a consultative examiner's
opinion may serve as substantial evidence in support of an ALJ's decision. Monguer v.
Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983). In fact, the ALJ only took issue with the
fact that Dr. Boehlert recommended Alford stay away from driving due to his seizure
activity. T. 27. Such findings are inconsistent with other substantial evidence in the
record, namely the recommendation by Dr. Braiman and the fact that Alford brought
him paperwork from the DMV (T. 363), as well as Alford's testimony that he drives his

21

wife to work and drove himself forty-five minutes to attend his hearing (T. 437-389).

Furthermore, Alford contends that the ALJ erred by not discussing or implementing significant limitations on the lifting ability he was able to do with his right hand. First, it is noteworthy that Alford testified that he was left handed and able to compensate for lifting by using his left hand. T. 446. Moreover, Alford attested that he can lift up to twenty pounds with his right hand. T. 435, 439. "Sedentary work involves lifting no more than [ten] pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Accordingly, Dr. Boehlert's recommendations against heavy exertion of the right hand were incorporated in the RFC. Accordingly, the ALJ did incorporate Dr. Boehlert's findings into the RFC where appropriate and, where he disagreed, namely with respect to Alford's ability to drive, he identified and outlined why. Therefore, the ALJ's determination should be affirmed.

Further, the ALJ's RFC assessment that Alford did not have any memory or cognitive defects, despite Alford's testimony, was also supported by substantial evidence. First, the psychiatric exam by Dr. Shapiro concluded that Alford's thought processes were coherent, his attention and concentration was intact, his remote and recent memory skills were intact, and his intelligence was average. T. 327. Further, Dr. Shapiro stated that Alford could understand and follow simple instructions, perform simple and some complex tasks, and maintain his attention and concentration for such tasks. T. 328. The "psychiatric symptoms are mild in nature, not atypical for someone in [Alford's] situation, and d[id] not warrant a formal diagnosis." Id. Such reports are consistent with Dr. Braiman who found no cognitive dysfunction. "The ability to follow

simple directions, perform simple tasks, and maintain attention and concentration are consistent with the ability to perform a full range of sedentary work." Anderson v. Comm. of Soc. Sec., No. 08-CV-850 (GJD), 2009 WL 3064764, at *8 (N.D.N.Y. Sept. 22, 2009) (citations omitted). As the opinion of the consultative examiner is consistent with that of the treating neurologist, both of which are supported by substantial evidence, it is clear that the ALJ's RFC assessment should be upheld.

Lastly, Alford contends that the ALJ was too imprecise in defining what "normal bathroom breaks" meant when discussing his RFC. When a gastrointestinal condition is deemed severe and noted to be significantly limiting, quantifying that limitation falls within the RFC which "must consider maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . mean[ing] 8 hours a day, for 5 days a week . . . ." White v. Barnhart, 340 F. Supp. 2d 1283, 1288 (N.D.Al. Oct. 6, 2004) (remanding case where plaintiff was diagnosed with interstitial cystitis, which was severe and disabling and a vocational expert determined that the plaintiff was unable to work due to the number of bathroom breaks which she must take). The ALJ did incorporate regular bathroom breaks as a portion of the RFC to credit the severe condition he found with the Crohn's disease; however, failing to specify an exact number or bring in a vocational expert was not error given the substantial evidence in the medical record. With the exception of one instance of colitis, Alford's Crohn's disease has been medicated and well treated since 2002. Alford did not proffer any complaints about this disease in the record outside of the flare up in 2009. Alford's discussions with his own treating physicians and consultative examiners never indicated that his Crohn's disease interfered with his day on a regular

and continuing basis.  See Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983)

("The [Commissioner] is entitled to rely not only on what the record says, but also on

what it does not say.").  In fact, there was never a discussion about the number of

bathroom breaks needed by Alford before, conversely the medical record indicated that

it was well treated.  For these reasons, this evidence contradicted Alford's later

complaints of excessive bowel movements and more severe restrictions than otherwise

contemplated by the ALJ.


### 3. Subjective Complaints of Pain

The ALJ determines whether an ailment is an impairment based on a two-part

test.  First, the ALJ must decide, based upon objective medical evidence, whether

"there [are] medical signs and laboratory findings which show . . . medical impairment(s)

which could reasonably be expected to produce [such] pain. . . ."  Barringer v. Comm'r

of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003).

This primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529

(2003).  "'Second, if the medical evidence alone establishes the existence of such

impairments, then the ALJ need only evaluate the intensity, persistence, and limiting

effects of a claimant's symptoms to determine the extent to which it limits the claimant's

capacity to work.'"  Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc.

Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept.

11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which

these symptoms are consistent with the medical and other evidence.  20 C.F.R. §

404.1529 (2003).  The claimant's credibility and motivation, as well as the medical

evidence of impairment, are used to evaluate the true extent of the alleged pain and the

degree to which it hampers the applicant's ability to engage in substantial gainful

employment.  See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).  The ALJ must

consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the
> claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any
> medication [the claimant] take[s] or ha[s] taken to alleviate . .
> . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant]
> receive[s] or ha[s] received for relief of . . . pain or other
> symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to
> relieve . . . pain or other symptoms (e.g., lying flat on [his]
> back, standing for 15 to 20 minutes every hour, sleeping on
> a board, etc.); and
>
> (vii) Other factors concerning [the claimant's] functional
> limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

Alford contends that the ALJ's credibility determination is unsupported by

substantial evidence.  Specifically, Alford took issue with the fact that the ALJ relied on

his daily activities to mitigate against his testimony that his leg cramps and dizziness

affected his ability to complete his activities of daily living.  In this case, the ALJ noted

that the objective medical evidence, the EEGs, EKGs, and flow studies of Alford's legs,

were are generally normal and relatively unremarkable, showing only mild findings which were consistent with his previous craniotomy and aneurysm. The ALJ then looked to Alford's daily activities. Alford's disability application indicated that his daily routine included driving his wife to work, eating breakfast, washing dishes, cleaning the house, picking his wife up from work, cooking dinner, and watching television at night. T. 144. Alford indicated that he could still clean, do laundry, mow, complete household repairs, and paint, but that things took him longer than they previously had to complete. T. 147. Alford's testimony did not change much when interviewed by the consultative examiners. Dr. Shapiro indicated that Alford could "dress, bathe, and groom himself but notes that buttons are hard for him. . . he can cook and prepare food, do general cleaning, laundry, shopping, manage money, and take public transportation." T. 328. Similarly, Dr. Boehlert noted that Alford reported the ability "to cook twice per week and to clean, do laundry, and shop once per week. He showers twice per week and dresses daily. He watches TV, listens to the radio, and reads. His hobby is video games." T. 331. Alford also reported to Dr. Ram that he was raking upon one of his visits. T. 254. While it is true "that a claimant need not be an invalid to be found disabled," this is not a case where Alford was unable to engage in activities comparable to those required of a sedentary job. Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (citations and internal quotation marks omitted). Instead, Alford's representations to physicians indicate an ability to do a varied amount of activities throughout the day, given the ability for intermittent breaks, which was clearly considered by the ALJ given his conclusion of sedentary work. Such capabilities are not indicative of an individual unable to sustain himself through the workday. Rivera v. Harris, 623 F.2d 212, 216 (2d

Cir. 1980) (finding that a claimants ability, "despite her pains and shortness of breath, [that] she can cook, sew, wash and shop, so long as she does these chores slowly and takes an afternoon rest . . . did not preclude the possibility that she could perform gainful activity of a . . . sedentary nature."); see also Ellington v. Astrue, 641 F. Supp. 2d. 322, 332 (S.D.N.Y. 2009) (finding it an error to compare a claimant to the one in Rivera where the claimant "does not cook, wash dishes, do laundry, or go shopping;" moreover, the fact that the claimant endured pain when leaving the house on limited occasions while taking walks and visiting the doctor could not be deemed indicative for an ability to work as such painful activities were engaged in because they were important to the claimant's health). The ALJ's reliance on Alford's abilities to complete these activities of daily living (T. 26), which were also supported by substantial medical evidence, were not in error in determining that Alford's allegations of pain were inconsistent with his RFC. To the extent that Alford contends the ALJ should have discussed in greater detail how his activities of daily living support his RFC, such arguments at best result in harmless error. Rockwood v. Astrue, 614 F. Supp. 2d 252, 271-72 (N.D.N.Y. Apr. 30, 2009) (citations omitted).

Moreover, the ALJ discussed at length the medical records and the interplay between those records and Alford's own contentions. The ALJ also spent a considerable amount of time identifying sources of inconsistencies between Alford's representations to his various providers, as well as inconsistencies between the determinations of the providers. These primarily pertained to Alford's syncope and ability to drive. As "[i]t is the function of the [Commissioner], not the reviewing courts, to resolve evidentiary conflicts and to appraise credibility of witnesses, . . . [i]f the

[Commissioner's] findings are supported by substantial evidence . . . the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." Aponte v. Sec., Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citations and internal quotation marks omitted). For the reasons stated supra, the record supports the findings of the ALJ that Alford's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." T. 26.

## E. Use of the Grids

The ALJ then conducted his Step Five analysis. The ALJ may apply the Grids or consult a vocational expert ("VE"). See Heckler v. Campbell, 461 U.S. 458, 462 (1983); Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999); 20 C.F.R. pt. 404, subpt. P, App. 2 (2003). "For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled." Pratts v. Chater, 94 F.3d 34, 38-39 (2d Cir. 1996). However, "where the claimant's work capacity is significantly diminished beyond that caused by his [or her] exertional impairment, the application of the grids is inappropriate," as the Grids do not take into account nonexertional impairments. Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986) (citations omitted). In this case, Alford contends that using the Grids was inappropriate and a vocational expert needed to be called regarding the effect of her Crohn's disease, specifically the need for frequent bathroom use.

While it is true that a vocational expert should be utilized where a claimant's

"frequent need to use a bathroom, pain, fatigue, and psychological symptoms are nonexertional impairments that limit jobs the [claimant] can still perform," this is not the present scenario. <u>Martin v. Astrue</u>, No. 07-CV-3911 (LAP), 2009 WL 2356118, at *14 (S.D.N.Y. July 30, 2009). "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guideline," rather such is "a case-by-case" determination considering whether the guidelines adequately reflect a claimant's abilities or whether nonexertional impairments constitute such a significantly limiting factor that other testimony is required. <u>Bapp v. Bowen</u>, 802 F.2d 601, 603, 605 (2d Cir. 1986). As explained <u>supra</u> no further testimony was required. Alford's Crohn's was documented to have been well controlled, despite his testimony indicating otherwise. Accordingly, while it was a consideration which the ALJ included in the RFC, further testimony was not required because the impairment did not significantly diminish Alford's abilities to the point where a vocational expert was required.

Accordingly, the ALJ's decision on this ground should be affirmed.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Alford's motion for judgment on the pleadings (Dkt. No. 16) be **DENIED** and the Commissioner's decision finding disability be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** <u>Roldan v. Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

It is further **ORDERED** that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Date: October 21, 2013
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge